

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| Paul Goldman )<br><br>Plaintiff, )<br><br>v. )<br><br>**Glenn Youngkin**, Governor of Virginia, in )<br>his official capacity, )<br><br>**Robert Brink**, Chairman of the State Board )<br>of Elections, in his official capacity, )<br><br>**John O'Bannon**, Vice Chair of the State )<br>Board of Elections, in his official capacity, )<br><br>**Georgia Alvis Long**, Secretary of the State )<br>Board of Elections, in her official capacity, )<br><br>**Susan Beals**, Commissioner of the State )<br>Board of Elections, in her official capacity, )<br><br>**Donald Merricks**, member of the State )<br>Board of Elections, in his official capacity, )<br><br>**Angela Chiang**, member of the State Board )<br>of Elections, in her official capacity, )<br><br>**Democratic Party of Virginia** )<br><br>**Susan Swecker**, Chairwoman of the )<br>Democratic Party of Virginia, in her official )<br>capacity, )<br><br>**Alexsis Rodgers**, Chairwoman of the )<br>4th Congressional District Democratic )<br>Committee, in her official capacity, )<br><br>Defendants. ) | Civil No. 3:22 cv789 |

## PETITION FOR DECLARATORY JUDGMENT AND REQUEST FOR PRELIMINARY INJUNCTION

Now comes Plaintiff Paul Goldman, *pro se*, filing the complaint herein, raising the constitutional issues below.

## THE IMPORTANCE OF THE CONSTITUTIONAL PRINCIPLES RAISED HEREIN

1.      This Complaint addresses serious and unfortunately long-standing constitutional infirmities with the statutory scheme created by the General Assembly for the implementation of the type of nomination process at issue.

2.      One overriding fact sums up what follows herein: to wit, never in Virginia history, nor American history to Plaintiff's knowledge, has there been a nomination process where voters in the majority of the jurisdictions in a Congressional District have no voting location in their jurisdiction.

3.      There are 15 independent cities or counties in the 4th Congressional District (hereinafter "4th CD"). The 15 jurisdictions combined have eight voting locations.

4.      Therefore, a majority of jurisdictions will not have a polling location within the jurisdiction.

5.      This means those registered to vote in those jurisdictions must drive to another jurisdiction to exercise their right to vote.

6.      In the eight jurisdictions without a voting location, the overwhelming number of Democrats are racial minorities.

7.      In these jurisdictions, the majority of Democrats are women from working-class families.

8.      The nomination process at issue is a caucus process, known in Democratic Party circles as a "firehouse primary."

2

9.      There is no voting by mail in a firehouse primary as there is in the usual state-run primary.

10.     All the voters must cast their votes in person at one of the eight polling locations.

11.     Accordingly, for example, all the elderly and otherwise fiscally challenged voters who normally cast a vote by mail or who walk to a polling location in their locality are in large measure disenfranchised.

12.     Those in the military and out of state are denied the right to vote.

13.     There is no early voting location.

14.     In the seminal case of *Harper v. Virginia Board of Elections*, 383 U.S. 663, (1966), the U.S. Supreme Court ruled that imposing a $1.50 "poll tax" violated the U.S. Constitution since "it makes the affluence of the voter or payment of any fee an electoral standard." *Id.* at 666.

15.     *Harper* concluded "wealth or fee paying has…no relation to voting qualifications (and thus) the right to vote is too precious, too fundamental, to be so burdened or conditions." *Id.* at 670.

16.     The cost of travelling required by the nomination at issue is far more than the poll tax.

17.     The legislative grant of power under which the Democratic Party of Virginia (hereinafter "DPVA") claims the power to do this disenfranchising voter suppression process is Virginia Code Sections 24.2-508 and 510.

18.     However, the delegation they claim for authority has been conveyed by a facially unconstitutional statutory scheme, which has been unconstitutionally applied by DPVA to violate the voting rights of the Democrats in the 4th CD. See, e.g., *General Electric v. New York State Dept. of Labor,* 936 F. 2d 1448 (2nd Cir. 1991), *Eubank v. City of Richmond*, 226 U.S. 137, 144 (1912), and *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

19.    The Call to Caucus detailing this "firehouse primary" was issued on December 13, 2022.

Exhibit 1.

20.    The Call was issued by the 4th District Democratic Committee, an entity of the DPVA.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C.

1331, as this case involves questions of federal law, and over a request for a Preliminary

Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

22.    Venue is proper in, and Defendants are subject to, the personal jurisdiction of this Court

because Defendants are citizens of Virginia, operate in their official capacities in the Eastern

District of Virginia, and all or most of the events giving rise to this action occurred in this

District.

23.    Plaintiff likewise resides in this District.

24.    The seat of government for the Commonwealth of Virginia is in this District.

## PARTIES

25.    Plaintiff Paul Goldman is a registered voter in the City of Richmond.

26.    He has been assigned the 105th precinct for the purposes of casting a vote.

27.    This precinct is within the 4th CD.

28.    His registered voter address is a short walk to the 105th precinct voting location.

29.    However, according to the nomination plan presented by the Democratic Party, he will

not be able to cast a ballot at the 105th precinct.

30.    Instead, he will need to drive to another location in another part of the City.

31.    This location would require more than an hour roundtrip by public transportation based

on information and belief.

4

32.     Glenn Youngkin is the Governor of the Commonwealth of Virginia. He is a citizen of the Commonwealth of Virginia. His office is in Richmond. He is being sued in his official capacity.

33.     Defendant Robert Brink is the Chair of the State Board of Elections. He is a citizen of the Commonwealth of Virginia. His office is in Richmond, Virginia. He is being sued in his official capacity.

34.     Defendant John O'Bannon is the Vice Chair of the State Board of Elections. He is a citizen of the Commonwealth of Virginia. His office is in Richmond, Virginia. He is being sued in his official capacity.

35.     Defendant Georgia Alvis Long is the Secretary of the State Board of Elections. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond, Virginia. She is being sued in her official capacity.

36.     Defendant Donald Merricks is a member of the State Board of Elections. He is a citizen of the Commonwealth of Virginia. His office is in Richmond, Virginia. He is being sued in his official capacity.

37.     Defendant Angela Chiang is a member of the State Board of Elections. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond, Virginia. She is being sued in her official capacity.

38.     Defendant Susan Beals is the Commissioner of the Virginia Department of Elections. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond, Virginia. She is being sued in her official capacity.

39.     The Virginia State Board of Elections ("hereinafter State Board") is tasked by state law to ensure "legality and purity in all elections" and to "ensure that major risks to election integrity

are...addressed as necessary to promote election uniformity, legality and purity." Virginia Code 24.2-103(A).

40.     The Virginia Department of Elections is the operational arm used by the State Board to ensure that the State Board is fulfilling its duty to ensure the integrity, purity, and uniformity of state elections.

41.     The Defendant Democratic Party of Virginia is designated as one of two political organizations recognized as political party for purposes of Virginia Code Section 24.2-508 et seq.

42.     The DPVA is headquartered in Richmond.

43.     Defendant Susan Swecker is the Chairwoman of the Democratic Party of Virginia. She is a citizen of the Commonwealth of Virginia. Her office is in Richmond. She is being sued in her official capacity.

44.     Defendant Alexsis Rodgers is the Chairwoman of the 4th Congressional District Democratic Committee and is designated the Legislative 4th District Chair by the Call to Caucus. She is a citizen of the Commonwealth of Virginia. She resides in this District. She is being sued in her official capacity.

## STATEMENT OF FACTS

45.     On November 8, The Honorable A. Donald McEachin, a member of the House of Representatives in the Congress of the United States from the 4th Congressional District of the Commonwealth of Virginia, was reelected to another term.

46.     The 4th CD consists of 15 different and distinct counties and independent cities.

47.     244,972 residents eligible to vote from the district cast ballots on that Election Day in 2022.

6

48.   159, 044 of them voted for Mr. McEachin running as a Democrat.

49.   The least number of votes he received from any jurisdiction in the 4th CD came from the City of Emporia, where 840 citizens voted for him.

50.   His death therefore left a vacancy, both as regards the remainder of his current term and the new full term he had earned the right to serve beginning with the opening of the new Congress on January 3, 2023.

51.   The Constitution of the United States says all vacancies in the House of Representatives must be filled by an election.

52.   In Virginia, the required election is designated a Special Election. Virginia Code Section 24.2-681 et seq.

53.   Such Special Elections require a Writ of Election from the Governor of Virginia.

54.   Virginia Code Section 24.2-683 details the substance of said Writ.

55.   The Governor set the Special Election for February 21, 2023.

56.   Under Virginia law, this required the DPVA to have the Democratic nominee for the Special Election by no later than December 23, 2022. Virginia Code Section 24.2-510.5.

57.   At all times since the premature death of Congressman McEachin, the DPVA knew their nomination process would be a speedy affair.

58.   On December 12th, the 4th Congressional District Democratic Committee, a subordinate entity of the DPVA, met for the first time to discuss the process to be used to choose the nominee.

59.   According to Virginia law, the DPVA had been granted unfettered legislative authority to conduct said nomination process. Virginia Code Section 24.2-508.

7

60.     The Chair of the DPVA is responsible for transmitting the name of the nominee to the Virginia Board of Elections in a timely fashion. Virginia Code Section 24.2-511(A).

61.     As required by the procedures of the DPVA, the 4th CD Committee met to write the Call to Caucus, the name used by the DPVA for the document issued by this Committee outlining the conduct of the nomination process.

62.     The DPVA chose a caucus process, or in the lingo of the political community, a "firehouse primary" to select the Democratic nominee for the Special Election.

63.     Upon information and belief, the DPVA has always chosen to conduct said "firehouse primary" on a Saturday.

64.     Upon information and belief, the DPVA has always had at least one polling location in every jurisdiction in the electoral district to be contested.

65.     On December 13, 2022, the 4th CD Committee, operating for the DPVA, issued the Call to Caucus, along eventually with a list of polling locations.

66.     Five voting locations were chosen throughout the 4th CD.

67.     As the DPVA and its subordinate 4th CD entity knew, a normal primary process would include more than 200 polling locations, including no less than three in each jurisdiction.

68.     On the next day, three more voting locations were announced.

69.     The Democratic constituency in the 4th CD, by and large, consists of working-class voters,  especially non-white women with families making a modest wage.

70.     The voting rights of these voters are most negatively impacted by any rules and procedures placing not merely burdens, but unprecedented burdens on their core political rights, which include the right to vote and the right of association for political purposes, as protected by the First and Fourteenth Amendments to the Constitution.

8

71.     The Democratic Party of the United States has repeatedly promised said voters, as have

their elected Governors, Senators, members of Congress, and members of the General

Assembly, to protect said rights for actions of those operating under the color of law.

72.     These leaders have particularly attacked Republicans for supporting voter suppression

measures, especially former President Donald Trump.

73.     Ther are 15 jurisdictions in the 4th CD.

74.     The DPVA rules and procedures for this public nomination process conducted under state

law allocates no voting locations for a majority of the jurisdictions.

75.     By any objective standard, such a factual result operates voter suppression regardless of

the partisan label.

76.     The rules of this "firehouse primary" also require candidates to pay a $3,480 fee and to

submit the signatures of 150 qualified voters.

## THE LAW OF THE CASE

77.     The General Assembly has delegated certain powers regarding the elective process to the

DPVA, such as delegation to "(iii) provide for the nomination of candidates, including the

nomination of its candidates for office in case of any vacancy." Virginia Code Section 24.2-508.

78.     This statute granting the DPVA the legislative power to conduct the nomination process

for this Special Election contains no restriction or specific criteria or detailed standard except,

indeed totally unfetteredly except for the timelines discussed *supra*.

79.     It is well settled that a nomination process for an entity like the DPVA recognized as a

major political party is considered "state action" and thus even though the DPVA is not a

government entity, the nomination process so chosen must comply with the Constitution of the

9

United States. *Smith v. Allwright*, 321 U.S. 649 (1944), *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996).

80.     The right to vote is a "fundamental political right." *Yick Wo v. Hopkins, supra* at 370.

81.     Indeed the right to vote has been deemed "preservative of other basic civil and political rights" and thus any potential "infringement of the rights of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 561, 562 (1964).

82.     *Reynolds*, a seminal case on the rights of citizens in state legislative elections, further said the constitutionally protected right to vote includes the right to cast an effective vote. *Id.* at 565.

83.     The Supreme Court in *Williams v. Rhodes*, 393 U.S. 23 (1968) went further, saying the right to cast an effective vote was not merely covered by the Fourteenth Amendment, but it also includes the First Amendment right "to associate for the advancement of political beliefs." *Id.* at 30.

84.     When a state such as Virginia, either directly through a statutory enactment, or indirectly through statutory enactment delegating legislative power to a private organization such as a political party, allows such a statutory scheme to burden protected constitutional rights, the state can only justify the ensuring state action by showing the scheme is necessary to support a compelling state interest. *Williams*, *supra*, at 30.

85.     In such circumstances, the normal presumption of constitutionality provided to state legislative enactments is not applicable, as such a presumption cannot be the basis for deciding issues involving fundamental political rights. *Kramer v. Union Free School District*, 359 U.S. 621, 628 (1969).

86.     For example, the Supreme Court in *Harper* ruled even a $1.50 poll tax placed too heavy a burden for the First Amendment to bear, as even this small amount weighed down the right to vote through an impermissible wealth factor.

87.     Large fees had "a real and appreciable impact on the exercise of the franchise," and thus laws permitting such fees had to be "closely scrutinized" and "found reasonably necessary to the accomplishment of legitimate state interests in order to pass constitutional muster." *Id.* at 144.

88.     In terms of the Equal Protection Clause as applied to a restriction on voting rights, the Fourth Circuit had occasion to discuss this general matter in *Dixon v. Md. State Administrative Board of Election Laws*, 878 F. 2d 776 (4th Cir. 1989).

89.     The Court found, as Plaintiff avers, that there must be both a Fourteenth Amendment analysis and a First Amendment analysis to ensure a state statutory scheme does not unconstitutionally infringe on the precious rights of citizens therein enshrined. *Id.*

90.     The seminal case of *Anderson v. Celebrezze*, 460 U.S. 780 (1983), along with *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214 (1989), were cited as offering a more appropriate judicial review standard. *Dixon, supra* at 780.

91.     While Plaintiff believes "strict scrutiny," as in *Harper*, is the proper standard of review for the unprecedented burdens placed on protected political rights by a process requiring voters in the majority of jurisdictions to travel to another jurisdiction to cast a ballot, the scheme at issue would still fail badly under *Anderson*.

92.     Anderson employed a balancing test requiring the government to meet a far higher burden than mere "rationality" while not being required to scale the "strict scrutiny" hurdle.

11

93.     The statute granting the power to the DPVA is thus facially unconstitutional as it contains no guidelines whatsoever, thus leading to the travesty at issue in this instant matter.

94.     The DPVA is granted only such power as the General Assembly itself constitutionally possessed.

95.     The General Assembly could not directly pass a nomination scheme providing only eight voting locations in the 4th CD, leaving a majority of the jurisdictions without a voting location.

96.     Accordingly, the DPVA likewise had no such authority.

## UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER

97.     Even a cursory reading of the statute and statutory scheme at issue exposes the utter failure of the General Assembly to provide the minimum guardrails required. See, e.g., *Eubank*, *General Electric*, and *Yick Wo*, *supra*.

98.     The delegation of such formidable power must satisfy the Due Process Clause of the Fourteenth Amendment to the United States Constitution, enacted to prevent government abuse of power. See, e.g., *DeShaney v. Winnebago County*, 489 U.S. 189 (1989).

99.     It must satisfy the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, indeed also the *Harper* test, since the scheme will require residents in the majority of jurisdictions to spend time and money to travel or their voting rights will be suppressed.

100.    The Due Process Clause limits the manner and extent to which a state legislature may delegate legislative authority to a private party. See, e.g., *Yick Wo*.

101.    Since *Allwright* had already answered the "state action" issue, the failure of the Virginia statutes to provide any, much less sufficient, limitation on the Party's authority, runs afoul of the Due Process Clause.

102.   Accordingly, the statutory scheme is facially defective.

103.   But assuming, *arguendo*, the statute is deemed not facially defective, it has been used and applied by the DPVA in a most unconstitutional vote-suppressing fashion.

104.   The rights at issue, that of the right to vote and the right of association for political purposes, are among our core political rights. *Meyer v. Grant*, 488 U.S. 414 (1988).

105.   It is well settled that the state, even when operating through a "state actor," has a weighty burden to justify imposing such a barrier. *Anderson, supra*.

106.   Plaintiff concedes the state, whether operating directly or indirectly, has legitimate compelling interests to take such constitutional measures as are needed to ensure fair and free elections.

107.   But in order to justify laws burdening core political rights, the state must show that these laws are necessary to protect such compelling interests.

108.   Plaintiff believes the proper judicial standard for determining whether the state has met this burden, as applied in this case, is the "strict scrutiny" standard of *Harper*.

109.   But even if the lesser Anderson standard is used, there is no possible justification limiting the number of voting locations to eight such locations, in but seven of the 4th CD's 15 jurisdictions, was necessary to protect said interest.

## **STANDING**

110.   As a registered voter in the 4th CD, Plaintiff has protected constitutional rights as regards the nomination process, such rights including the right of association.

111.   As a former DPVA party chair, the Plaintiff has both the experience and expertise to know how to join with others in the 4th CD to advocate for their mutual political beliefs.

112.   Plaintiff's efforts to develop biracial coalitions for this purpose are well known and the subject of several books.

113.   Thus Plaintiff, as a practical matter, understood the devastating burden to his right of association when such right is suppressed by the hurdles in the nomination process at issue, such as no voting locations in the majority of jurisdictions.

114.   Based on his experience and expertise, this unconstitutional burden is the most severe in the Commonwealth since the poll tax and other suppression measures used by the segregationist Byrd Machine. See *Remaking Virginia Politics*, written by Plaintiff.

115.   The right of association and the right to cast your ballot are essential to our democratic institutions. *Williams, supra.*

116.   "Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to ban together" to promote their views. *California Democratic Party v., Jones*, 530 U.S. 567, 574 (2000).

117.   But for the Plaintiff being white, he would be able to use the Voting Rights Act of 1965 to easily show the unconstitutionality and unlawfulness in this instant matter.

118.   Yet the burdens of litigation, in terms of the cost, in terms of finding a lawyer willing to take on the case *pro bono* and willing to risk angering the dominant political establishment, often make it impossible for the Voting Rights Act to be used by the very citizens so intended.

119.   Why should Plaintiff's color deny him the right to defend the rights of these citizens when he and they, while different in race, have the same mutual interest in ensuring a constitutional process to nominate a Democrat of their own Party?

## PRELIMINARY INJUNCTION IS JUSTIFIED

120.   "A preliminary injunction is an extraordinary remedy." *Real Truth About Obama v. Federal Election Commission*, 575 F. 3d 342 (4th Cir. 2009).

121.   The Fourth Circuit applies the standards articulated in *Winter v. Natural Resources Defense Council Inc*, 129 S. Ct 365 (2008) in deciding whether or not to grant a motion for a preliminary injunction. *Real Truth*, *supra* at 345.

122.   The *Winter* standard consists of four distinct factors. *Id.*

123.   This requires the plaintiff to establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 346 citing *Winter*.

124.   All four requirements must be met. *Id.*

125.   As to the first requirement, Plaintiff has demonstrated far more than a likelihood of success on the merits.

126.   The delegation of authority from the General Assembly contains no legislatively defined criteria or standards limiting the power of the DPVA in the process under review.

127.   The use of only eight voting locations in the entire 4th CD, given the burden it imposes in time and cost on working families to exercise their right to vote, is a wealth test even more onerous than the poll tax.

128.   Accordingly, for the reasons set forth, the Court must conclude Plaintiff is likely to succeed on the merits.

129.   As to the second prong, that being the likelihood of the Plaintiff suffering irreparable damage, the very circumstance of this matter demonstrates such harm.

130.   The scheme requires Plaintiff to travel outside his assigned Council district, for the first time ever, to cast a cast a ballot.

131.   The scheme further severely burdens if not totally suppresses his ability to associate with likeminded Democrats in the majority of jurisdictions who lack the resources or time to join with Plaintiff in backing the candidate of their choice.

132.   Unless the Court rules on the issues raised in this instant matter prior to the voting on December 20, 2022, the damage to Plaintiff and those similarly situated will likely never be corrected.

133.   Since Plaintiff is likely to win on the merits, a failure to issue a preliminary injunction means this case would proceed as normal, and should Plaintiff prevail, there would exist no remedy to rectify the violation of his constitutional rights along with the rights of tens of thousands of others.

134.   Forcing Plaintiff to spend likely 40 minutes round trip to exercise his constitutional rights when there is a far less onerous action that the state can take either directly or operating through a "state actor" violates *Anderson*, *supra*, and *Harper, supra*.

135.   Accordingly, the second prong of the *Winter* standard has been met.

136.   As to the third prong, when the equities are properly weighed, the public interest is surely best served by a Court Order ensuring that citizens are not denied their right to vote, indeed not denied their right to cast an effective vote during the nomination process and thus, in effect, the general election as well. *Williams*, *supra*.

137.   Thus, the third prong of the *Winter* test is satisfied.

138.   Focusing on the final prong, a preliminary injunction is manifestly in the public interest.

139.   Given the growing public skepticism toward our election process, a failure to grant a preliminary injunction only risks heaping more fuel on that fire.

140.   In that connection, the interests of the DPVA and its leadership, along with the defendant members of the Board of Elections, and the Governor, not to mention the ultimate winner of the Democratic nomination at issue would clearly be better protected by increasing, not decreasing, public respect for our electoral system.

141.   When the cost of the public viewing a state sanctioned nomination where the elites of the political system are clearly trying to shape a process benefiting their preferred candidate to the detriment of the interests of many tens of thousands of hardworking citizens is weighted against an immediate hearing to ensure a fair process for these same citizens, it is clear the public interest is best served by granting Plaintiff's relief.

142.   There is sufficient time for the DPVA to do the process in accordance with the Constitution and still have a nominee with sufficient time to campaign effectively in the February 21, 2023 Special Election by order of a federal court.

143.   Accordingly, the fourth prong of the *Winter* test has been met.

144.   Therefore, as required, Plaintiff has met all four of the required parts of the *Winter* standard.

145.   The *Winter* standard having been easily met, a preliminary injunction, to ensure the protection of the most fundamental voting rights in our system, the right to vote being the protector of other rights, should be issued in this matter.

## COUNT ONE: VIOLATION OF THE DUE PROCESS CLAUSE

146.   Plaintiff incorporates by reference paragraphs 1 through 145, *supra*.

147.   The Fourteenth Amendment, of which the Due Process Clause is part, incorporates

certain of rights provided to citizens by the Bill of Rights, such rights among them found in the

First Amendment. *Palko v. Connecticut*, 302 U.S. 319. 324 (1937).

148.   The Fourteenth Amendment limits the nature of the delegation of power the General

Assembly of Virginia could give a private entity such as the Democratic Party of Virginia. See,

e.g., *General Election, supra*.

149.   It is axiomatic that the General Assembly cannot authorize a private party to do indirectly

what the government is constitutionally prohibited to do directly. *Allwright, supra*.

150.   Therefore, in the context of the instant matter, the General Assembly could not give the

Democratic Party of Virginia the power to suppress if not eradicate the vote of countless

number of citizens by virtue of a scheme having only eight voting locations.

151.   Accordingly, Plaintiff is challenging the constitutionality of the statutory scheme,

Virginia Code Section 24.2-508 being the main culprit, as both unconstitutional on its face and

unconstitutional as applied.

152.   Therefore, Plaintiff's rights guaranteed under the Due Process Clause of the Fourteenth

Amendment to the United States Constitution are being violated, as DPVA is claiming it has

been delegated power to arbitrarily eradicate fundamental voting rights while the Virginia State

Board of Elections stays quiet.

153.   Plaintiff asks that the Court declare the statutory scheme unconstitutional, that the DPVA

be enjoined from holding a nomination process as contained in the Call to Caucus at issue in

this matter.

154.   Plaintiff asks that the Writ of Election be voided and the Virginia Board of Elections be instructed to ensure that the nomination process in question is consistent with the Constitution of the United States.

155.   Plaintiff asks the Court to take such other action as it deems required, including the awarding of monetary damages, litigation costs and attorney fees.

## COUNT TWO: VIOLATION OF THE FIRST AMENDMENT

156.   The Plaintiff incorporates by reference paragraphs 1 through 155, *supra*.

157.    The First Amendment protects "core political" rights including the right to vote and the right to cast an effective vote. *Meyer*, *supra*, *Reynolds*, *supra*.

158.   The "state action" doctrine applies in this instant matter. *Allwright, supra*.

159.   Given that the core political rights being infringed are among our most protected political rights, the state will need to overcome the highest possible strict scrutiny to demonstrate the scheme is absolutely necessary to protect a compelling state interest. *Meyer v. Grant*, 486 U.S. 414 (1988).

160.   Indeed, this is true even if the less stringent Anderson standard is employed.

161.   Plaintiff therefore asks the Court to enjoin the DPVA from holding the current nomination process.

162.   Plaintiff further asks that the Court enjoin the Virginia Board of Elections from certifying the nominee for a place on the Special Election general election ballot.

163.   Plaintiff further asks the Court to award such other relief as it deems necessary including monetary damages, litigation costs, and attorney fees as may be appropriate.

## REMEDY

For the reasons stated above, based upon fact and law, comes now Plaintiff asking this Honorable Court for the following relief:

(A) Issuance of a preliminary injunction against the Defendant DPVA, a state actor, from implementing the nomination process as detailed in the Call to Caucus at issue in this instant matter;

(B) Issuance of a preliminary injunction enjoining the members of the Virginia Board of Elections from certifying to the Special Election general election ballot the nominee chosen by the DPVA nomination process in the Call to Caucus at issue in this matter;

(C) Issuance of a declaratory judgment finding Virginia Code Section 24.2-508 as facially unconstitutional or in the alternative as unconstitutional as applied in this instant matter on the grounds it constitutes an unconstitutional delegation of legislative authority;

(D) Such other remedy as the Court deems necessary to ensure a constitutional process for choosing a Democratic nominee in the Special Election at issue in this instant matter;

(E) Such other relief including monetary damages, litigation costs, and attorney fees as may be deemed appropriate.

Respectfully submitted by:

Dec. 16/22

Paul Goldman
Richmond, Va.
Goldmanusa@aol.com
*Pro se*

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on December 16, 2022, this Complaint for Declaratory Judgement and Preliminary Injunction was hand delivered, along with a Motion for a hearing for a Preliminary Injunction, to the Clerk of the Court. A true copy of said Complaint and Motion was also sent, via first class mail, to:

The Honorable Glenn Youngkin

Office of the Governor
111 East Broad Street
Richmond, VA 23219

Robert Brink
John O'Bannon
Georgia Alvis Long
Donald Merricks
Angela Chiang
Susan Beals

1100 Bank Street
First Floor
Richmond, VA 23219

Susan Swecker
Alexsis Rodgers
Democratic Party of Virginia

919 East Main Street
Richmond, VA 23219

Respectfully,

Paul Goldman
Richmond, Va.
Goldmanusa@aol.com
*Pro se*