IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

|  |  |  |
|---|---|---|
| PAUL GOLDMAN, *et al.*, <br> Plaintiffs, <br><br> v. <br><br> GLENN YOUNGKIN, *in his official capacity, et al.,* <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.  3:22CV789 (RCY) |

**MEMORANDUM OPINION**

Paul Goldman, Tavorise Marks, Tamia Douglas, Tina McCray, Julie Michele Pope, Jamale Pope, Richard Walker, and Dawnette Drumgoole (collectively, "Plaintiffs") bring this action against Virginia Governor Glenn Youngkin, Chairman of the Virginia State Board of Elections Robert Brink, Vice Chair of the State Board of Elections John O'Bannon, Secretary of the State Board of Elections Georgia Alvis Long, Commissioner of the State Board of Elections Susan Beals, State Board of Elections member Donald Merricks, and State Board of Elections member Angela Chiang, all in their official capacities (collectively, the "Commonwealth Defendants"), and against the Democratic Party of Virginia ("DPVA"), DPVA Chairwoman Susan Swecker, and Chairwoman of the Fourth Congressional District Democratic Committee Alexsis Rodgers, both in their official capacities (jointly with the DPVA, the "DPVA Defendants").  Plaintiffs allege that Defendants unconstitutionally set and conducted the December 20, 2022 "firehouse primary" (hereinafter, the "Primary"), which was held to nominate a Democratic candidate for the U.S. House of Representatives seat vacated with the passing of Congressman Donald McEachin.

This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction (ECF No. 12).  The Motion has been briefed (ECF Nos. 25, 26), and the Court heard oral argument on

January 18, 2023. At the conclusion of oral argument, the Court ruled from the bench and DENIED the motion, promising an opinion to follow. This memorandum opinion expounds upon the Court's reasoning.

## I. BACKGROUND

### A. Procedural Posture

This matter was initiated by *pro se* Plaintiff Paul Goldman, who filed a Complaint in his individual capacity on December 16, 2022 (four days[1] before the Primary). Plaintiff also filed an accompanying Motion for Hearing on a Preliminary Injunction (ECF No. 2) to enjoin the Primary from taking place. Goldman did not collect the summonses to serve Defendants prior to the Primary and subsequently retained counsel, who then filed an Amended Complaint ("First Amended Complaint") on December 21, 2022 (ECF No. 6). The First Amended Complaint added Plaintiffs Douglas, McCray, J.M. Pope, J. Pope, and Walker.

On December 22, 2022, the Court issued an Order denying as moot Plaintiff's Motion for Preliminary Injunction, given that the relief sought (postponement of the Primary) was no longer available due to the passage of time. (ECF No. 8.)

On December 30, 2022, Plaintiffs retained new counsel and, having not yet served Defendants with the first Amended Complaint, filed a Second Amended Complaint[2,3] and new Motion for Preliminary Injunction. (ECF Nos. 11, 12.) Summonses were returned executed on

---

[1] The Complaint was filed late in the day on Friday, December 16, and thus, practically speaking, Goldman filed with only one full business day remaining before the Primary at issue.

[2] The Second Amended Complaint added Plaintiff Drumgoole.

[3] Defendants all argue that the Second Amended Complaint was improperly filed and the First Amended Complaint controls, because Plaintiffs are only permitted one amendment without the consent of Defendants or leave of court, per Fed. R. Civ. P. 15(a). However, because Defendants were never served with the First Amended Complaint and had not appeared in the case, there was no way (or need) to require their consent to a Second Amended Complaint's filing, and the Court did not find that its leave was required.

January 3, 2023 for all Defendants except Governor Youngkin. On January 4, 2023, Plaintiffs filed a Second Motion for Preliminary Injunction Hearing (ECF No. 17), requesting that the matter be set for a hearing on January 5, 2023, as early and absentee voting was due to begin on Friday, January 6, 2023, and because counsel for Plaintiffs would be out of the country from January 6–16, 2023. The Court postponed ruling on the Motion until it received notice that Defendant Governor Youngkin had been served.

On Friday, January 6, 2023, the Court was informed that Governor Youngkin was served on January 4, 2023. Finding that Plaintiffs' request for a January 5 hearing had been rendered moot by the passage of time, but cognizant of the time-sensitive nature of Plaintiffs' claims, the Court accordingly set the matter for an expedited hearing on the Motion for Preliminary Injunction on January 18, 2023 and ordered Defendants to file any desired responses to the Motion for Preliminary Injunction by noon on January 16, 2023 (ECF No. 23). On January 16, the Commonwealth Defendants and the DPVA Defendants each filed a Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction (ECF Nos. 25 and 26, respectively). The Court heard additional arguments from counsel at a hearing on January 18, 2023. Based on the parties' filings and oral arguments presented, the Court denied Plaintiffs' Motion for a Preliminary Injunction at the conclusion of the January 18 hearing.

**B. Factual[4] Overview**

Congressman Donald McEachin died unexpectedly on November 29, 2022. (2d Am. Compl. (hereinafter, "Compl.") ¶ 3, ECF No. 11.) To fill McEachin's seat in the U.S. House of Representatives, on December 12, 2022, Virginia Governor Glenn Youngkin issued a Writ of

---

[4] "The facts reproduced here are merely preliminary facts and do not represent factual findings for any purpose other than the resolution of the instant motion." *Pro-Concepts, LLC v. Resh*, No. 2:12cv573, 2013 WL 5741542, at *1 n.1 (E.D. Va. Oct 22, 2013).

Special Election per Va. Code § 24.2-209, setting a Special Election for February 21, 2023. (Compl. ¶¶ 4, 5; DPVA Defs' Mem. Opp'n Mot. for Prelim. Inj. (hereinafter, "DPVA Mem. Opp'n"), Ex. B, ECF No. 26-2.)

The General Assembly of Virginia controls the manner, conduct, administration, and other necessary rules and procedures for the nomination process in any state election, per the Virginia Constitution. (Compl. ¶ 6.) The General Assembly granted the authority to choose the nomination process for any Democratic nominee in a Special Election to the DPVA, according to Va. Code §§ 24.2-508 *et seq*. (Compl. ¶ 7.) This primary-structuring power is not limited by any guidelines or standards (Compl. ¶¶ 16–17, 21), other than a timing requirement found in the Virginia Code. Specifically, the Virginia Code provides that "[e]ach political party shall have the power to . . . provide for the nomination of its candidates, including the nomination of its candidates for office in case of any vacancy." Va. Code § 24.2-508. The Virginia Code further provides that, when a Writ of Special Election is issued more than 60 days before the date of the forthcoming Special Election, political parties must nominate their candidate for the Special Election at least 60 days before the election. Va. Code § 24.2-510(5)(i). To select a candidate for the upcoming Special Election, the Fourth Congressional District Democratic Committee chose to utilize an unassembled caucus process, colloquially known as a "firehouse primary." (Compl. ¶ 10; DPVA Mem. Opp'n Ex. C, ECF No. 26-3.)

On December 13, 2022, the day after the issuance of the Governor's Writ of Election, the Fourth Congressional District Democratic Committee issued a Call to Caucus announcing its chosen process for the Primary and setting the Primary for December 20, 2022 (a Tuesday), with five specified voting locations. (DPVA Mem. Opp'n Ex. C (Call to Caucus).) The Call to Caucus did not provide any options for early voting or mail-in ballots. (Compl. ¶¶ 12–14.) The next day, the DPVA secured three additional voting locations, bringing the total number of Primary voting

locations to eight. (DPVA Mem. Opp'n Ex. D, Decl. of Syam Raman, ECF No. 26-4.) The eight voting locations were distributed across seven of the 4th Congressional District's 15 jurisdictions. (Compl. ¶ 22.)

Plaintiffs allege, upon information and belief, that the DPVA has always chosen to conduct similar "firehouse primaries" on a Saturday and has always had at least one polling location in every jurisdiction in the district to be contested. (Compl. ¶¶ 108–09.) Plaintiffs allege that the selection of jurisdictions to have polling locations was arbitrary, given that, when Congressman McEachin was originally elected, he received more votes from certain jurisdictions that ultimately did not have a polling location for the Primary than he did votes within jurisdictions that were allocated a polling location. (Compl. ¶¶ 128–32.)

Plaintiffs allege that the Primary, as structured, imposed a "wealth burden" on voters, insofar as the majority of voters would not have a primary within easy walking or "short driving" distance, and the majority of eligible Democratic voters were non-white females, largely from working-class families and thus disproportionately impacted. (Compl. ¶¶ 20, 24–25, 27.) Plaintiffs further allege that a "significant percentage" of eligible Democratic voters were elderly citizens, working women with childcare responsibilities, and citizens of modest means who did not have a car and thus might not be able to bear the cost necessary to take public transportation to a voting location outside their home precinct. (Compl. ¶ 26.) Plaintiffs allege that the DPVA knew the burden it was imposing on voters constituted an unconstitutional barrier to the ability to exercise voters' core First Amendment right to political speech, given that, in a 2015 EDVA case, the DPVA itself alleged that "equivalent type measures affecting the right to vote unconstitutionally burdened voters, especially minority voters of modest means." (Compl. ¶ 29 (citing *Lee v. Virginia State Board of Elections, et al.*, 155 F. Supp. 3d, 572 (E.D. Va. 2015) (case challenging Virginia's voter ID laws and long wait times at polling stations)).) Plaintiffs allege

that the travel costs imposed by the limited number of polling locations is the legal equivalent of, but functionally speaking worse than, an unconstitutional poll-tax. (Compl. ¶ 24.)

Plaintiffs also briefly allege that the Primary was unconstitutional because it did not provide a method for a would-be candidate to qualify for the ballot without paying a filing fee of $3,480.00, and that an alternative method is required by Supreme Court precedent. (Compl. ¶¶ 46, 111–12.)

As to the Plaintiffs themselves, Plaintiffs Douglas and McCray allege that they were unable to vote in the primary, despite attempting to do so, because of extremely long lines and other commitments (e.g., job or family). (Compl. ¶¶ 55–60.) Plaintiff Drumgoole alleges that she was unable to vote in the Primary due to lack of timely notice about the limited number of polling locations and inability to travel to the closest polling location due to such short notice. (Compl. ¶ 70–72.)

Plaintiff Marks was a candidate on the ballot for the Primary and successfully voted in the Primary. (Compl. ¶¶ 51–54.) Plaintiffs J.M. Pope, J. Pope, Walker, and Goldman all successfully voted in the Primary. (Compl. ¶¶ 61–69.)

## II.  REQUESTED RELIEF

Plaintiffs' Motion for Preliminary Injunction asks the Court to enjoin the Virginia Board of Elections from certifying the nominee chosen through the Primary (Jennifer McClellan) "before any such nominee can be printed on the ballot" for the upcoming Special Election. (Pls.' Mot. Prelim. Inj. 14, ECF No. 12.)

## III. STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) ("Perry II") (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008)). Such remedy

is "never awarded as of right." *Winter*, 555 U.S. at 24. The power to issue a preliminary injunction derives from the common law of equity and is frequently described as an "extraordinary" remedy that is left to the discretion of the trial court. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citations omitted); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2941 (3d ed. Oct. 2020).

In order to be eligible for a preliminary injunction, the party seeking such relief must demonstrate each of the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and, (4) the public interest. *Winter*, 555 U.S. at 20; *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010), reinstated in relevant part, 607 F.3d 355 (4th Cir. 2010). Plaintiffs, as the party seeking a preliminary injunction, bear the burden of establishing that each factor supports granting the injunction. *Real Truth*, 575 F.3d at 346. Each factor must be demonstrated by a "clear showing." *Winter*, 555 U.S. at 22. The failure to show any one of the relevant factors mandates denial of the preliminary injunction. *Real Truth*, 575 F.3d at 346.

Above and beyond the *Winter* standard, however, is the Supreme Court's well-established "bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled." *Merrill v. Milligan*, 142 S. Ct. 879, 880–81 (2022) (Kavanaugh, J., concurring). The Supreme Court "has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election—a principle often referred to as the *Purcell* principle." *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay) (referencing *Purcell v. Gonzalez*, 549 U.S. 1 (2006)). "Late judicial tinkering with election laws can lead to disruption and to unanticipated and

unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881.

The *Purcell* principle does not represent an absolute rule "that a district court may *never* enjoin a State's election laws in the period close to an election," but rather "heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id*. A plaintiff can overcome the *Purcell* principle "if a plaintiff establishes at least the following:

(i) the underlying merits are entirely clearcut in favor of the plaintiff;
(ii) the plaintiff would suffer irreparable harm absent the injunction;
(iii) the plaintiff has not unduly delayed bringing the complaint to court; and,
(iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship."

*Id*. (citing *Lucas v. Townsend*, 486 U.S. 1301 (1988) (Kennedy, J., in chambers); *McCarthy v. Briscoe*, 429 U. S. 1317 (1976) (Powell, J., in chambers).

Pursuant to *Merrill*, therefore, the Court need not reach the *Winter* analysis if a plaintiff does not satisfy all the elements needed to qualify for an exception to the *Purcell* principle.[5]

### IV. ANALYSIS

The Court denies Plaintiffs' Motion for Preliminary Injunction because Plaintiffs have not established any—let alone all four—of the elements necessary to qualify for an exception to the *Purcell* principle, and thus the "practical considerations" embodied by *Purcell* dictate that the Court "of necessity allow the [Special Election] to proceed without an injunction," *Purcell*, 549 U.S. at 5–6; *see also Riley v. Kennedy*, 553 U.S. 406, 426 (2008) ("practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges.").

---

[5] Moreover, if a plaintiff cannot satisfy the *Purcell* exception elements, they would necessarily fail on a *Winter* analysis, given the overlap in the merits and irreparable harm prongs.

Additionally, for many of the same reasons Plaintiffs cannot overcome the *Purcell* principle, Plaintiffs cannot satisfy the *Winter* elements to qualify for a preliminary injunction in this case.

**A. *Purcell* Analysis**

The Constitution places the principal responsibility for setting and holding elections with the state legislatures. *See* U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof . . . ."); *Growe v. Emison*, 507 U.S. 25, 34 (1993) (reiterating that "the Constitution leaves with the States primary responsibility for apportionment of their federal congressional and state legislative districts"). "Thus, the federal Constitution provides States—not federal judges—the ability to choose among many permissible options when designing elections." *Wise v. Circosta*, 978 F.3d 93, 99 (4th Cir. 2020) (quoting *Middleton v. Andino*, 976 F.3d 403, 404–05 (4th Cir. 2020) (Wilkinson and Agee, J.J., dissenting)). The *Purcell* principle enshrines this deference and dictates that federal judges should largely leave to the states determinations regarding their own election processes.

In this case, Plaintiffs have not shown that an exception to the *Purcell* principle is warranted. The Court considers each of the *Purcell* exception elements in turn, although failure on any single element is enough to disqualify Plaintiff from exception to the principle. *See Merrill*, 142 S. Ct. at 881.

1. Underlying Merits

The underlying merits of the case are not "entirely clearcut" in favor of Plaintiffs. *Merrill*, 142 S. Ct. at 881. To begin with, at least five Plaintiffs have highly questionable standing. Four Plaintiffs—Ms. J.M. Pope, Ms. J. Pope, Mr. Walker, and Mr. Goldman—all successfully voted in the Primary and have shown no injury in fact. Similarly, Plaintiff Marks both successfully qualified as a candidate for the Primary ballot and successfully voted, and so likewise has shown

no injury in fact.  Meanwhile, there is a question of fact as to whether Plaintiffs Douglas and McCray voted, based on differing allegations in the First and Second Amended Complaints.  Assuming for present purposes that, as alleged in the Second Amended Complaint, Plaintiffs Douglas and McCray did not in fact vote, their purported injury, and that of Plaintiff Drumgoole, is speculative at best.  Particularly, Plaintiffs did not satisfactorily show that such injury is clearly traceable to Defendants' conduct.  However, the Court is also not entirely convinced by Defendants' claim that the present circumstance is not of the sort that is capable of repetition yet evading review, as argued at the January 18, 2023 hearing.  Thus, the Court will accept subject matter jurisdiction for present purposes.

As to the substance of Plaintiffs' claims, the Constitution clearly assigns the power to set and hold elections to state legislatures.  *See* U.S. Const. art. I, § 4, cl. 1.  Virginia's legislature in turn has clearly authorized state political parties to orchestrate their own methods for nominating a candidate for federal office.  *See* Va. Code § 24.2-509.  Contrary to Plaintiffs' characterization of this as an unconstitutional delegation of legislative authority, the Supreme Court has determined that "the process by which a political party 'selects a standard bearer who best represents the party's ideologies and preferences'" is a protected exercise of First Amendment rights. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (quoting *Eu v. San Francisco Cty Demcratic Cent. Comm.*, 489 U.S. 214, 224 (1989)).  Thus, Plaintiffs' challenge of Va. Code § 24.2-508, *et seq*. as a violative of the Due Process Clause is not likely to succeed.

Moreover, Plaintiffs have not shown a likelihood of success on either the First Amendment or the Equal Protection Clause claims because there has been no showing of state action involved in the DPVA's selection of processes for its Primary that could form the basis of an Equal Protection or First Amendment claim against the Defendants.  The DPVA is not a state or government entity, as acknowledged by Plaintiffs.  (Compl. ¶ 139 ("The DPVA is not a

government entity.").) And, because the Primary was structured, operated, and funded wholly by the DPVA, not the state, there is no basis for arguing that the DPVA's conduct can be attributed to the Commonwealth Defendants in any way. (DPVA Mem. Opp'n Ex. D at ¶ 8, ECF No. 26-4.) Thus, Plaintiffs cannot state a claim predicated on state action. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972) (stating that the Equal Protection Clause "erects no shield" against "private conduct, however discriminatory or wrongful." (internal quotations omitted)); *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) ("Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law…." (internal quotations omitted)).

Finally, Plaintiffs are unlikely to succeed on the merits of their claim under the Voting Rights Act ("VRA") because they fail to allege sufficient facts to support an inference that the Defendants discriminated against an identifiable protected class. Rather, Plaintiffs make general and conclusory allegations that Defendants intentionally designed the Primary to discriminate against "elderly citizens" and voters of "modest means"—neither of which are a protected class under the VRA. *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 363 (E.D. Va. 2009) ("the explicit language of the Voting Rights Act requires that alleged abridgment arise on account of race or color.") Plaintiffs make one conclusory allegation that Defendants "can be presumed to have known that their scheme would make it far harder for the minority voters of modest means who dominate in these rural areas without a voting location." (Compl. ¶ 236.) This lone, conclusory allegation is far from sufficient to show that the merits are "entirely clearcut" in Plaintiffs' favor. Thus, Plaintiffs have not demonstrated that they satisfy the merits prong of the *Purcell* exemption as set forth in *Merrill*.

### 2. Irreparable Harm

Plaintiffs also have failed to satisfy the irreparable harm element of the *Purcell* exemption. To begin with, Plaintiffs' own delay weighs against a finding of irreparable harm. *See Smart Vent Prods., Inc. v. Crawl Space Door Sys., Inc.*, No. 13-5691, 2016 WL 4408818, at *12 (D.N.J. Aug. 16, 2016) ("delay… 'knocks the bottom out of any claim of immediate and irreparable harm.'" (quoting *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 383-84 (D.N.J. 2002); also collecting cases)). Plaintiffs repeatedly failed to collect and serve the summonses prepared by the clerk's office in order to move their litigation forward, and did not finally do so until after the Second Amended Complaint was filed, which in turn was over a week after Fourth Congressional District Democratic Committee Chairwoman Alexsis Rodgers had certified the results of the Primary. (Commonwealth Mem. Opp'n Pls.' Mot. Prelim. Inj., Ex. 1-2 (Exhibit to the Declaration of Susan Beals: Party Certification of Non-Primary Candidate form filed with the Virginia Department of Elections pursuant to Va. Code § 24.2-511, dated Dec. 22, 2022), ECF No. 25-1 at 7.) This delay, brought about by Plaintiffs and wholly within their control, counsels against a finding that waiting for the Court to adjudicate this case on the merits according to the standard litigation timeline will result in immediate and irreparable harm to Plaintiffs.

Separately, Plaintiffs argued at the January 18 hearing that the "irreparable harm" that all Plaintiffs will suffer—even those who voted—absent injunctive relief is damage to voters' perception of the integrity of the electoral system. But Plaintiffs presented nothing beyond the pontification of counsel at oral argument to show that this harm is occurring and will continue to occur absent the relief sought. Further, the historic level of voter participation seen in the Primary—27,900 votes cast, almost double the participation seen in the last regularly scheduled state-run primary in this same Congressional district (DPVA Mem. Opp'n Ex. D ¶¶ 7, 9.)—suggests that there is ample faith in the integrity of the party's chosen nomination process.

In this case, Plaintiffs have not shown that the requested relief—a preliminary injunction and ultimately (moving beyond preliminary injunction) a court order directing the DPVA to re-conduct the Primary according to specifications determined by Plaintiffs—would guarantee that Plaintiffs and similarly situated voters would not still face logistical hurdles or work or family conflicts that complicate getting to a polling location, or long lines at the particular time they might arrive to such location.

Accordingly, the Court does not find that Plaintiffs have demonstrated irreparable harm absent the Court's intervention into the ongoing Special Election process.

3. <u>Undue Delay</u>

Plaintiffs also have not demonstrated that they brought their complaint to court without undue delay. As set forth previously in this memo, Plaintiff Goldman filed his initial *pro se* Complaint shortly before 5:00 PM on December 16, 2022, barely one full business day before the Primary at issue was to begin. Despite the clerk's office notifying Plaintiff that summonses for the Defendants were ready to be collected for service the very next business day (*see* ECF No. 3 and related docket entry on 12/19/2022), Plaintiff never picked up the summonses. (*See* ECF No. 7 and related docket entry.) Instead, Plaintiff retained counsel, who filed the First Amended Complaint on December 21, 2022, the day after the Primary. No proposed summonses were prepared or submitted to the Court or clerk's office, however, and Defendants again went unserved.

On December 30, 2022, Plaintiffs' new counsel filed the Second Amended Complaint, this time with proposed summonses, and summonses were issued that same day. Plaintiffs returned executed summonses as to most Defendants on January 3, 2023, and filed a Second Motion for Preliminary Injunction Hearing on January 4, 2023, but did not provide any proof of service as to Governor Youngkin. It was not until the Court, cognizant of the time-sensitive nature of Plaintiffs'

13

claims, initiated contact with the parties to inquire as to the status of service on January 6, 2023, that the Court finally received unofficial confirmation that the Governor had in fact been served.[6]

In light of the two weeks that it took Plaintiffs to settle on an operative Complaint and their lack of diligence in effecting service on any of the three Complaints filed in this action, there is a strong argument that Plaintiffs unduly delayed bringing their complaint before the Court in an actionable sense. Without confirmation of service upon all Defendants, the Court could not take up Plaintiffs' Motion for Preliminary Injunction, and even with inquiries from the Court as to the status of service, the Court did not receive confirmation until the day absentee and early voting for the Special Election began. Now, in order to grant the relief Plaintiffs seek, the Court would have to invalidate any votes already cast for the Special Election. While this bleeds into the next *Purcell* element, it also heavily impacts the question of undue delay and weighs against Plaintiffs.

4. <u>Costs, Confusion and Hardship</u>

Plaintiffs are unable to satisfy the fourth *Purcell* exception element because the changes sought—invalidation of the certification of Jennifer McClellan and re-printing of ballots for the Special Election—are not "feasible before the election" because early and absentee voting for the Special Election has already begun. As mentioned immediately above, to de-certify the current Democratic nominee, grant Plaintiffs' request to redesign the primary process, and re-do the Democratic primary would necessitate halting and invalidating the already-begun Special Election process. Beyond the fact that none of this can happen "before the election," to make any of these changes would certainly cause great confusion and hardship to any voters who have already exercised their vote since January 6, 2023. Moreover, it would also certainly impose significant costs on both the DPVA (who would have to organize and conduct another primary) and the state

---

[6] Proof of service has yet to be filed, as to Governor Youngkin.

(who would have to re-print ballots and re-schedule the Special Election). Accordingly, Plaintiffs also fail to qualify for an exception to the *Purcell* principle on this final basis.

For all the above reasons, Plaintiff has not shown good cause to upset the "bedrock tenet of election law" that district courts should ordinarily not take it upon themselves to upend state election processes. *Merrill*, 142 S. Ct. at 880. Accordingly, the *Purcell* principle controls, and the Court should allow the Special Election to proceed.

**B.  *Winter* Analysis**

The Court sees no need to address the *Winter* factors in depth, given that failure to show any one of the four factors (likelihood of success on the merits, likelihood of irreparable harm, balance of equities, and pubic interest) mandates denial of the preliminary injunction, *Real Truth*, 575 F.3d at 346, and the Court's *Purcell* analysis above demonstrates that Plaintiffs have failed to show at least two of the *Winter* factors: likelihood of success on the merits and irreparable harm. Thus, the Court will deny the request for preliminary injunction.

### IV. CONCLUSION

For the reasons discussed above, and in accordance with the Court's decision from the bench on January 18, 2023, the Court denies Plaintiffs' Motion for Preliminary Injunction (ECF No. 12).

Let the Clerk file this Memorandum Opinion electronically and notify all counsel of record accordingly.

Richmond, Virginia
Date: January 23, 2023

/s/ Rcy
Roderick C. Young
United States District Judge