IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PAUL GOLDMAN, *et al.*,            )
                                    )
    Plaintiffs,                    )
                                    )
    v.                             )    Civil Action No.  3:22CV789 (RCY)
                                    )
GLENN YOUNGKIN, *in his official*   )
*capacity, et al.*,                 )
                                    )
    Defendants.                    )
                                    )

**MEMORANDUM OPINION**
**(Granting Motions to Dismiss)**

This is a civil and voting rights action arising from the Democratic Party of Virginia's so-called "firehouse primary"[1] that occurred on December 20, 2022.  Paul Goldman, Tavorise Marks, Tamia Douglas, Tina McCray, Julie Michele Pope, Jamale Pope, Richard Walker, and Dawnette Drumgoole (collectively, "Plaintiffs") bring this action against Virginia Governor Glenn Youngkin, Chairman of the Virginia State Board of Elections Robert Brink, Vice Chair of the State Board of Elections John O'Bannon, Secretary of the State Board of Elections Georgia Alvis Long, Commissioner of the State Board of Elections Susan Beals, State Board of Elections member Donald Merricks, and State Board of Elections member Angela Chiang, all in their official capacities (collectively, the "Commonwealth Defendants"), and against the Democratic Party of Virginia ("DPVA"), DPVA Chairwoman Susan Swecker, and Chairwoman of the Fourth Congressional District Democratic Committee Alexsis Rodgers, both in their official capacities

---

[1] Technically, the December 20 voting was part of an "unassembled caucus" process, not a "primary". (DPVA Defs.' Mem. Supp. Mot. Dismiss ("DPVA Mem. Supp."), Ex. B ("Call to Caucus"), ECF No. 37-2; *see also infra*, n.2.)  Although the colloquial term for the process, "firehouse primary," runs the risk of conflation with state-run primaries, the Court makes use of Plaintiffs' phrase while also noting the legal and procedural distinction.

(jointly with the DPVA, the "DPVA Defendants"). Plaintiffs' claims include violations of the First Amendment of the United States Constitution, the Due Process and Equal Protection clauses of the Fourteenth Amendment of the United States Constitution, and Section 2 of the Voting Rights Act. The crux of Plaintiffs' grievances is the number of voting locations available to voters and the short period of time between the announcement of the "firehouse primary" and its occurrence.

The case is presently before the Court on two Motions to Dismiss (ECF Nos. 34, 36), both of which seek dismissal based on Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs have filed no response to either Motion. Despite Plaintiffs' failure to defend jurisdiction and the sufficiency of their claims, the Court is nevertheless obligated to ensure that dismissal is proper even when, as here, the motion to dismiss is unopposed. *See Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 416 n.3 (4th Cir. 2014). The Court dispenses with oral argument, as Defendants' arguments are clear on the face of their pleadings, and the interest of the voters of Virginia in participating in an election unshrouded by ongoing litigation supports an efficient resolution of this case.

## I. STANDARD OF REVIEW

A motion under Rule 12(b)(1) tests the court's subject matter jurisdiction. The plaintiff bears the burden of proving proper subject matter jurisdiction as the party asserting jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). On a 12(b)(1) motion, the district court is to regard the pleadings' allegations as mere evidence on the issue and may consider facts outside the pleadings without converting the motion to one for summary judgment. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

Dismissal pursuant to Rule 12(b)(6) is appropriate if a party fails to state a claim under which relief can be granted. In considering a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are taken as true, and the complaint must be viewed in the light most favorable to the

plaintiff. *T.G. Slater & Son, Inc. v. Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004). Importantly, legal conclusions enjoy no such deference by the reviewing court. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing the complaint for facial sufficiency, the court must parse out legal conclusions and enriching commentary. As the United States Court of Appeals for the Fourth Circuit pointed out in *Francis v. Giacomelli*, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." 588 F.3d 186, 193 (4th Cir. 2009) (citing *Bell Atl Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks omitted). "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. To survive Rule 12(b)(6) scrutiny, a complaint must allege facts sufficient "to raise a right to relief above the speculative level," stating a claim that is "plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, on a [12(b)(6)] motion to dismiss." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013) (citing *Braun v. Maynard*, 652 F.3d 557, 559 n.1 (4th Cir. 2011)). However, the court may consider documents attached or incorporated into the complaint, "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

## II. STATEMENT OF FACTS

Accepting as true Plaintiffs' well-pleaded allegations and viewing the Complaint in the light most favorable to Plaintiffs, the Court determines the operable facts to be as follows:

United States Congressman Donald McEachin died unexpectedly on November 29, 2022. (2d Am. Compl. (hereinafter, "Compl.") ¶ 3, ECF No. 11.) To fill McEachin's seat in the U.S. House of Representatives, on December 12, 2022, Virginia Governor Glenn Youngkin issued a Writ of Special Election pursuant to Va. Code § 24.2-209, setting a Special Election for February 21, 2023. (*Id.* ¶¶ 4, 5; Commonwealth Defs.' Mem. Supp. Mot. Dismiss ("Commonwealth Mem. Supp."), Ex. 1, ECF No. 35-1.)

The General Assembly of Virginia controls the manner, conduct, administration, and other necessary rules and procedures for the nomination process in any state election, per the Virginia Constitution. (Compl. ¶ 6.) The General Assembly granted the authority to choose the nomination process for any Democratic nominee in a Special Election to the DPVA, pursuant to Va. Code §§ 24.2-508 et seq. (*Id.* ¶ 7.) This primary-structuring power is not limited by any guidelines or standards (*Id.* ¶¶ 16–17, 21), other than a timing requirement found in the Virginia Code. Specifically, the Virginia Code provides that "[e]ach political party shall have the power to . . . provide for the nomination of its candidates, including the nomination of its candidates for office in case of any vacancy." Va. Code § 24.2-508. The Virginia Code further provides that, when a Writ of Special Election is issued more than 60 days before the date of the forthcoming Special Election, political parties must nominate their candidate for the Special Election at least 60 days before the election. Va. Code § 24.2-510(5)(i). To select a candidate for the upcoming Special Election, the Fourth Congressional District Democratic Committee chose to utilize an unassembled caucus process, colloquially known as a "firehouse primary" (hereinafter, the "Primary"). (Compl. ¶ 10; Call to Caucus, ECF No. 37-2.[2])

---

[2] Plaintiffs' Second Amended Complaint references the Call to Caucus and cites it as Exhibit 1 to the Complaint, but there were no attachments filed with the Second Amended Complaint (ECF No. 11). The Call to Caucus *was* attached to the original Complaint and First Amended Complaint, however. (ECF Nos. 1-1, 6-1.) For ease of reference to this integral document, the Court uses the docket citation for the Call to Caucus filed with the DPVA Defendants' Memorandum in Support of their Motion to Dismiss (ECF No. 37-2; *see supra* n.1 (full citation)).

On December 13, 2022, the day after the issuance of the Governor's Writ of Election, the Fourth Congressional District Democratic Committee issued a Call to Caucus announcing its chosen process for the Primary and setting the Primary for December 20, 2022 (a Tuesday), with five specified voting locations. (Call to Caucus, ECF No. 37-2.) The Call to Caucus did not provide any options for early voting or mail-in ballots. (*Id*.; *see also* Compl. ¶¶ 12–14.) The next day, the DPVA secured three additional voting locations, bringing the total number of Primary voting locations to eight. (Compl. ¶¶ 37–39.) The eight voting locations were distributed across seven of the Fourth Congressional District's fifteen jurisdictions. (*Id*. ¶ 22.)

Plaintiffs allege that when Congressman McEachin was originally elected, he received more votes from certain jurisdictions that ultimately did not have a polling location for the Primary than he did votes within jurisdictions that were allocated a polling location. (*Id*. ¶¶ 128–32.)

Plaintiffs further allege that the Primary, as structured, imposed a "wealth burden" on voters, insofar as the majority of voters would not have a primary within easy walking or "short driving" distance, and the majority of eligible Democratic voters were non-white females, largely from working-class families and thus disproportionately impacted. (*Id*. ¶¶ 20, 24–25, 27.) Plaintiffs also allege that a "significant percentage" of eligible Democratic voters were elderly citizens, working women with childcare responsibilities, and citizens of modest means who did not have a car and thus might not be able to bear the cost necessary to take public transportation to a voting location outside their home precinct. (*Id*. ¶ 26.) Plaintiffs allege that the DPVA knew the burden it was imposing on voters constituted an unconstitutional barrier to the ability to exercise voters' core First Amendment right to political speech, given that, in a 2015 EDVA case, the DPVA itself alleged that "equivalent type measures affecting the right to vote unconstitutionally burdened voters, especially minority voters of modest means." (*Id*. ¶ 29 (citing

5

*Lee v. Virginia State Board of Elections, et al.*, 155 F. Supp. 3d, 572 (E.D. Va. 2015) (case challenging Virginia's voter ID laws and long wait times at polling stations)).)

Lastly, Plaintiffs briefly allege (though divorced from any specific count or claim against Defendants) that the Primary's process for candidate-qualification as set forth in the Call to Caucus "failed to provide a method for a citizen to qualify for the ballot as a candidate without paying the filing fee." (*Id.* ¶ 46.)

As to the Plaintiffs themselves, Plaintiffs Douglas and McCray allege that they were unable to vote in the primary, despite attempting to do so, because of extremely long lines and other commitments (e.g., job or family). (*Id.* ¶¶ 55–60.) Plaintiff Drumgoole alleges that she was unable to vote in the Primary due to lack of timely notice about the limited number of polling locations and her inability to travel to the closest polling location due to such short notice. (*Id.* ¶¶ 70–72.)

Plaintiff Marks successfully qualified and appeared as a candidate on the ballot for the Primary, and he successfully voted in the Primary. (*Id.* ¶¶ 51–54.) Plaintiffs J.M. Pope, J. Pope, Walker, and Goldman all successfully voted in the Primary. (*Id.* ¶¶ 61–69.)

### III. ANALYSIS

Plaintiffs raise four[3] claims in the Second Amended Complaint. In Counts One and Two, Plaintiffs claim that Virginia Code § 24.2-508, the statute authorizing the DPVA to "make its own rules and regulations" and "provide for the nomination of its candidates," is an impermissible delegation of legislative authority and that Defendants' application of § 24.2-508 violates the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 137–38, 188–215.) In Count Three, Plaintiffs claim the DPVA's candidate-nomination process (as established by the Call to Caucus)

---

[3] Counts One and Two of the Second Amended Complaint both challenge the alleged unconstitutional delegation of legislative power represented by the statutory scheme found in Va. Code § 24.2-508, so the Court treats those as one claim for purposes of organization and analysis.

imposed an unconstitutional burden on Plaintiffs' First Amendment rights. (*Id.* ¶¶ 152–63, 216–22.) In Count Four, Plaintiffs claim that the number and location of voting sites violated the Equal Protection Clause by imposing "unequal burdens on the ability to cast a vote due to wealth, location, physical condition, family status, and any number of criteria which all contribute to putting [voters] in unequal categories." (*Id.* ¶¶ 224–32.) Lastly, Plaintiffs claim in Count Five that Defendants violated Section 2 of the Voting Rights Act because the DPVA intentionally discriminated against certain voters and "can be presumed to have known that their scheme would make it far harder for the minority voters of modest means who dominate in [rural areas without a convenient voting location] to cast ballots." (*Id.* ¶¶ 234–37.)

In their Motions to Dismiss, the Commonwealth Defendants and DPVA Defendants both argue that Plaintiffs lack standing and their claims are moot. (Commonwealth Mem. Supp., ECF No. 35, 14–21; DPVA Mem. Supp., ECF No. 37, 8–15.) As an additional jurisdictional matter, the Commonwealth Defendants argue that Plaintiffs have failed to state any claim against the Commonwealth Defendants that constitutes an ongoing violation of federal law and thus Plaintiffs cannot overcome sovereign immunity as to their claims against the Commonwealth Defendants specifically. (Commonwealth Mem. Supp. at 7–14.) Finally, both sets of Defendants argue that Plaintiffs have failed to state any claim upon which relief can be granted, and thus the case should be dismissed. (Commonwealth Mem. Supp at 21–30; DPVA Mem. Supp. 15–23.)

For the reasons set forth below, the Court finds that Plaintiffs have failed to overcome the Commonwealth Defendants' jurisdictional defense of sovereign immunity, Plaintiffs have not demonstrated standing, and finally that, jurisdictional questions aside, Plaintiffs have failed to state a claim upon which relief may be granted. Accordingly, the Court will grant Defendants' Motions to Dismiss.

### A. Jurisdiction

Defendants first raised questions as to the Court's jurisdiction and Plaintiffs' standing in connection with Plaintiffs' Motion for Preliminary Injunction. Plaintiff did not rebut Defendants' arguments at the hearing on the Motion for Preliminary Injunction on January 18, 2023, and Plaintiff has since failed to respond to the arguments again, this time in connection with Defendants' Motions to Dismiss. As a procedural matter alone, then, Plaintiffs have arguably failed satisfy their burden of proving subject matter jurisdiction. *Potomac R.R. Co.*, 945 F.2d at 768 (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Nevertheless, the Court engages with the requisite analysis to ensure dismissal is proper. *Stevenson*, 743 F.3d at 416 n.3.

*1. Sovereign Immunity*

Sovereign immunity "denies to the federal courts authority to entertain a suit brought by private parties against a state without its consent." *Ford Motor Co. v. Dept' of Treasury of State of Ind.*, 323 U.S. 459, 464 (1945). Sovereign immunity extends not just to states, but also to their "agents and [ ] instrumentalities," *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997), including officials sued in their official capacities, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id*. Thus, state officers sued in their official capacity are "entitled to Eleventh Amendment protection." *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001). Here, all the Commonwealth Defendants are sued solely in their official capacities. Thus, each Commonwealth Defendant is entitled to a presumption of Eleventh Amendment immunity barring all of Plaintiffs' claims.

Sovereign immunity is overcome only if the state has voluntarily waived the immunity or if Congress has validly abrogated the state's immunity. *See Va. Office for Protection & Advocacy*

*v. Stewart*, 563 U.S. 247, 253 (2011); accord *Litman v. George Mason Univ.*, 186 F.3d 544, 549–50 (4th Cir. 1999). Plaintiffs do not allege that Virginia waived its immunity or consented to be sued in this context. Moreover, Plaintiffs fail to identify any cause of action against the Commonwealth Defendants for which Congress has abrogated Virginia's sovereign immunity. *See, e.g., Hughes v. Bedsole*, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995) (a plaintiff "cannot bring a claim directly under the Fourteenth Amendment because it does not create a cause of action"); *McBride v. Dunn*, 2008 WL 11512373 at *16 (E.D. Va. Mar. 4, 2008) ("The First Amendment does not create a private cause of action, and therefore, the plaintiff cannot state an independent claim under the Constitution.") (citing *Boyle v. Harford County*, 2004 WL 3222888 at *5 (D. Md. Mar. 31, 2004) *aff'd*, 120 F. App'x 450 (4th Cir. 2005) (unpublished)); *Krieger v. Loudon Cty.*, 2014 WL 4923904 at *3 (W.D. Va. Sept. 30, 2014) (concluding that the Voting Rights Act does not contain the requisite language abrogating the state's Eleventh Amendment sovereign immunity), *aff'd sub nom. Krieger v. Virginia*, 599 F. App'x 112 (4th Cir. 2015); *N.C. State Conf. of the NAACP v. Cooper*, 397 F. Supp. 3d 786, 799–800 (M.D.N.C. 2019) (declining to find that Congress abrogated state sovereign immunity through the VRA and observing the lack of Fourth Circuit or Supreme Court precedent finding such abrogation). Finally, as the Court has disposed of Plaintiffs' request for preliminary injunctive relief, Plaintiffs' claims against the Commonwealth Defendants do not fall within the sovereign immunity exception recognized in *Ex parte Young*, 209 U.S. 123 (1908), which in certain circumstances "permits a federal court to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law." *Bland v. Roberts*, 730 F.3d 368, 390–91 (4th Cir. 2013).

Accordingly, the Court finds that Plaintiffs have failed to satisfy their burden of establishing the Court's jurisdiction over the Commonwealth Defendants, in light of the

protections afforded by sovereign immunity. All Plaintiffs' claims against the Commonwealth Defendants must therefore be dismissed.

*2. Standing*

At the hearing on Plaintiffs' Motion for Preliminary Injunction, the Court asked Plaintiffs' counsel to explain standing for those Plaintiffs who successfully voted in the December 20, 2022 "firehouse primary". Plaintiffs' counsel argued that Plaintiffs all shared an interest in seeing the democratic process perform correctly, but such a generalized interest is not the test for standing.

In order to satisfy the standing requirements of Article III of the Constitution, a plaintiff must demonstrate that: (1) they have suffered an injury in fact; (2) the asserted injury in fact is fairly traceable to, or caused by, the challenged action of the defendant; and (3) it is likely rather than just conjectural that the asserted injury in fact will be redressed by a decision in the plaintiff's favor. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000). "The injury-in-fact element requires that the plaintiff suffer an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (internal quotation marks omitted). Moreover, "a plaintiff must claim a specific, personalized injury in order to invoke the jurisdiction of a federal court because courts do not sit to entertain generalized grievances that are shared by the public at large." *Taubman Realty Group L.P. v. Mineta*, 198 F. Supp. 2d 744, 755 (E.D. Va. 2002) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992)). As noted above, Plaintiffs bear the burden of establishing the pre-requisites for jurisdiction and thus, likewise, for standing.

Plaintiffs J.M. Pope, J. Pope, Walker, Goldman, and Marks all successfully voted in the December 20, 2022 "firehouse primary." (Compl. ¶¶ 51–54, 61–69.) Plaintiff Marks also successfully qualified and appeared as a candidate on the December 20 ballot. (*Id.* ¶¶ 61–69.) These Plaintiffs therefore suffered no concrete and particularized injury from Defendants' alleged

conduct with respect to either the organization and conduct of the "firehouse primary" or the Call to Caucus's candidate-qualification procedure. Plaintiffs' counsel's argument that these Plaintiffs' standing is predicated on their interest in seeing the voting process "done correctly" is nothing more than the sort of "generalized grievance" that the Supreme Court has made clear is insufficient to confer standing. *Lujan*, 504 U.S. at 573–74.

As to Plaintiffs Douglas, McCray, and Drumgoole, Plaintiffs have not demonstrated that their asserted injury in fact—their inability to vote in the Primary—is fairly traceable to, or caused by, the challenged action(s) of Defendants. Neither have Plaintiffs demonstrated that a favorable outcome for Plaintiffs—at this point, with the Primary having occurred, a court order halting the Special Election and directing a re-do of the Democratic Primary, with more voting locations and more advance notice—would be likely to redress Plaintiffs' injury, rather than such redress being merely conjectural. Even taking Plaintiffs' allegations as true, that Plaintiffs Douglas and McCray were unable to vote because they faced "extremely long line[s]" and had competing work and family commitments (Compl. ¶¶ 55–60), Plaintiffs have not demonstrated or even alleged that, had there been more voting locations or had they been given notice of the Primary further in advance, they would not still have faced long lines or had those competing obligations. The Primary saw historic levels of voter turnout, with 27,900 other individuals successfully voting. *See* DPVA Mem. Supp., ECF No. 37 at 11. Given this level of democratic participation, and absent any showing by Plaintiffs to the contrary, it is entirely plausible that Plaintiffs would still have faced long lines or personal logistical hurdles in casting their ballots, if there were more voting locations. Likewise for Plaintiff Drumgoole, while she may have faced personal logistical challenges in getting to a polling location, there has been no showing that this personal challenge was fairly traceable to Defendants, as almost every voter faces some sort of challenge in figuring out the best time and method of transport to a voting site. Further, Plaintiffs have not demonstrated

11

that Plaintiff Drumgoole's injury or inconvenience would be cured with the establishment of some unnamed number of additional voting locations, as there is no guarantee that an additional voting site would necessarily be assigned at a location more convenient to her, individually.

Accordingly, Plaintiffs have not satisfied their burden of showing that any one of them satisfies all the standing requirements of Article III of the Constitution, and the Second Amended Complaint must be dismissed in its entirety on that basis.

   *3. Mootness*

Given the Court's analysis and findings on sovereign immunity and standing, it declines to engage with Defendants' mootness arguments as well.[4]

**B. Failure to State a Claim**

Although the Court has determined that it lacks jurisdiction to hear the claims in Plaintiffs' Second Amended Complaint and need not engage with Defendants' arguments as to Plaintiffs' substantive allegations, in recognition of the serious rights at issue and to avoid any appearance of dismissing a claim that might otherwise have merit on a technicality, the Court will proceed to describe how Plaintiffs have failed to state any claim upon which relief may be granted.

As recited previously, Plaintiffs rest their claims on the First and Fourteenth Amendments and the Voting Rights Act. However, as also described previously, there is no private right of action under either the First or Fourteenth Amendments. *Hughes*, 48 F.3d at 1383 n.6; *McBride*, 2008 WL 11512373 at *16. Moreover, even had Plaintiffs properly brought their constitutional claims through the vehicle provided by 42 U.S.C. § 1983, Plaintiffs have identified no state action that could otherwise form the basis for a constitutional claim. *See White Coat Waste Proj. v.*

---

[4] Where there are multiple threshold reasons to dismiss a case, "a federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999)); see also *Ruhrgas AG*, 526 U.S. at 584 (federal law "does not dictate a sequencing of jurisdictional issues").


*Greater Richmond Transit Co.*, 35 F.4th 179, 189 (4th Cir. 2022) ("[C]ourts must ensure 'that constitutional standards' such as the First Amendment are only enforced 'when it can be said that the State is responsible for the specific conduct of which the plaintiff complains'—a requirement known as 'state action.'") (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001)); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972) (stating that the Equal Protection Clause of the Fourteenth Amendment "erects no shield" against "private conduct, however discriminatory or wrongful." (internal quotations omitted)); *Nat'l Collegiate Ath. Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) ("Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law . . . ." (internal quotations omitted)).  The United States Constitution clearly assigns the power to set and hold elections to state legislatures.  *See* U.S. Const. art. I, § 4, cl. 1.  Virginia's legislature in turn has clearly authorized state political parties—which are private entities—to orchestrate their own methods for nominating a candidate for federal office.  *See* Va. Code § 24.2-509.  Contrary to Plaintiffs' characterization of this authorization as an unconstitutional delegation of legislative power, the United States Supreme Court has determined that "the process by which a political party 'selects a standard bearer who best represents the party's ideologies and preferences'" is a protected exercise of First Amendment rights.  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000) (quoting *Eu v. San Francisco Cty Democratic Cent. Comm.*, 489 U.S. 214, 224 (1989)).  Therefore, even had Plaintiffs properly couched their claims under § 1983, Plaintiffs nevertheless fail to state any claim for violations of the First and Fourteenth Amendments (Counts One through Four) because they have identified no predicate state action.

As to their Voting Rights Act claim (Count Five), Plaintiffs have not alleged sufficient facts to state a claim for discrimination against an identifiable protected class.  Plaintiffs make general and conclusory allegations that Defendants intentionally designed the Primary to

discriminate against "elderly citizens" and voters of "modest means"—neither of which are a protected class under the VRA. *Perry-Bey v. City of Norfolk*, 678 F. Supp. 2d 348, 363 (E.D. Va. 2009) ("the explicit language of the Voting Rights Act requires that alleged abridgment arise on account of race or color.") Plaintiffs make one conclusory allegation that Defendants "can be presumed to have known that their scheme would make it far harder for the minority voters of modest means who dominate in these rural areas without a voting location." (Compl. ¶ 236.) This lone, conclusory allegation lacks the necessary "factual enhancement . . . to cross the line between possibility and plausibility of entitlement to relief," *Giacomelli*, 588 F.3d at 193, and thus the Court finds that the Second Amended Complaint fails to state a claim upon which relief may be granted under the Voting Rights Act.

Accordingly, jurisdictional issues aside, Plaintiffs have failed to state any claim upon which relief may be granted, and the Court must dismiss this action.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant Defendants' Motions to Dismiss (ECF Nos. 34, 36) and the matter will be dismissed. An appropriate Order will accompany this Memorandum Opinion.

/s/

Richmond, Virginia
Date: <u>February 21, 2023</u>

Roderick C. Young
United States District Judge